## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| MARILYN DONALD, as next-of-kin and wrongful death representative of the late MARCUS DONALD, in her individual capacity, and CHARLES DONALD, as next-of-kin and wrongful death representative of the late MARCUS DONALD, in his individual capacity, | ) ) ) ) ) ) ) ) | |
| | ) | No. 2:23-cv-02738-TLP-atc |
| Plaintiffs, | ) | JURY DEMAND |
| | ) | |
| v. | ) | |
| | ) | |
| FLOYD BONNER, JR., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON RULE 8 MOTIONS TO DISMISS
## AND SHELBY COUNTY'S RULE 12(b)(6) MOTION TO DISMISS

This is a tragic case. Plaintiffs Marilyn and Charles Donald, as next-of-kin and wrongful death representatives of the late Marcus Donald, sued Defendants Floyd Bonner, Jr.; Kirk Fields; Shelby County, Tennessee ("Shelby County" or "County"); T. Johnson; Dontreal Hawkins; Kimberly Wallace; Brenda McCoy; Grandberry; and Terri Parker.[1] (ECF No. 37 at PageID 602–05.) They allege claims under 42 U.S.C. § 1983 and under the Tennessee Governmental Tort Liability Act ("TGTLA"). (*Id.* at PageID 651–54.) Defendants Shelby County and Bonner now move to dismiss under Federal Rule of Civil Procedure 8, arguing the Complaint is too long and

---

[1] Plaintiffs also sued Lieutenant Filmore Varner, Natasha Williams, D. Robertson, Patrolman G. Smith, and T. Baker. (ECF No. 37.) But Plaintiffs agreed by stipulation to dismiss these parties. (ECF Nos. 74, 96, 123.)

confusing.  (ECF Nos. 14, 28, 45, 46.[2])  And Defendants Shelby County, Bonner, and Fields

move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a plausible

claim for relief.  (ECF Nos. 107, 76, 102.)  Plaintiffs oppose the motions.  (ECF Nos. 64, 65,

101, 110, 125.[3])

The Court will address the Rule 8 motions and Shelby County's motion under Rule

12(b)(6) here, but it will rule on Bonner's and Fields's 12(b)(6) motions by separate order.  For

the reasons explained below, the Court **DENIES** the Rule 8 motions and Shelby County's Rule

12(b)(6) motion.

## BACKGROUND

Marcus Donald was an inmate at the Shelby County Jail ("Jail") in 2022.  (ECF No. 37 at

PageID 605.)  On November 17, 2022, he pleaded guilty to the charges against him and received

a five-month sentence.  (*Id.*)  But because he had been in jail for over sixth months before

entering his guilty plea, Donald was immediately release-eligible.  (*Id.*)  Rather than release him

that same day, however, the Jail placed him in a cell with Stephen Robinson overnight.  (*Id.* at

PageID 606.)  Robinson then strangled Donald to death.  (*Id.* at PageID 600–01; *see also* ECF

No. 107-1 at PageID 1963 (Shelby County stating that Robinson "indisputably choked [Donald]

into unconsciousness").)

---

[2] Defendants Shelby County and Bonner renewed their initial motions to dismiss under Rule 8
after Plaintiffs amended their Complaint.  (*See* ECF Nos. 45, 46.)  As a result, the Court refers to
the renewed motions.

[3] Plaintiffs' response brief exceeds the page limit set out in the Local Rules for the Western
District of Tennessee.  L.R. 12.1(b) (limiting memoranda opposing motions to dismiss to 20
pages unless the Court grants prior approval).  (*See* ECF No. 125 (24 pages).)  In a footnote in its
reply, Shelby County moves to strike the entire response or to strike its excess pages.  (ECF No.
128 at PageID 2088 n.2.)  Typically, a request to strike a document from the docket comes by
way of separate motion rather than a footnote.  Without a separate motion and given the
complexity of this case, the Court **DENIES** the request to strike.  That said, the County's point is
well-taken, and in the future, all Parties will be expected to comply with the Local Rules.

According to the Amended Complaint, Robinson threatened in front of the guards that he would kill Donald, and Donald requested to be released or moved to another cell for his safety. (ECF No. 37 at PageID 606–07.)  But the Jail did neither, leaving him there.  Donald allegedly continued to ask to be moved from the cell.  (*Id.* at PageID 607–09.)  And other inmates allegedly pleaded on Donald's behalf.  (*Id.* at PageID 608.)  All told, Donald, Robinson, or other inmates allegedly alerted at least three corrections officers about the threats to Donald's safety. (*Id.* at PageID 607–09.)  One of those officers was Dontreal Hawkins, who reported Donald's request to her supervisors, meaning that reports about the threats allegedly reached three more corrections officers.  (*Id.* at PageID 609.)  Yet no one at the Jail addressed these warnings.  (*See id.* at PageID 607–12.)

Around midnight, Robinson strangled Donald in their shared cell.  (*Id.* at PageID 601, 610–11.)  Other inmates in the cell block allegedly tried to flag down a corrections officer, waving toward the camera, throwing personal items into the walkway, and yelling for assistance. (*Id.* at PageID 610–11.)  But no one came until 12:23 A.M., which was over an hour after a corrections officer last walked through the cell block and after other inmates allegedly tried to get help for Donald.  (*Id.*)  The corrections officers called an ambulance to transfer him to Regional One Health.  (*Id.* at PageID 611–12.)  Donald remained on life support until doctors declared that he was brain dead on November 23, 2022.  (*Id.* at PageID 612.)

Now his parents, as next-of-kin and wrongful death representatives, bring this action in federal court against Defendants Floyd Bonner, Jr.; Kirk Fields; Shelby County; T. Johnson; Dontreal Hawkins; Kimberly Wallace; Brenda McCoy; Grandberry; and Terri Parker.  (*See generally id.*)  They bring claims against Shelby County under 42 U.S.C. § 1983 over its staffing, supervision, and release procedures, and against the individual Defendants under § 1983 for their

conduct leading to Donald's death.  (*Id.* at PageID 637–51.)  Plaintiffs also allege negligence

claims against the County under the TGTLA.  (*Id.* at PageID 651–54.)

Defendants Robertson, Baker, Varner, McCoy, Hawkins, Williams, Grandberry, Smith,

Johnson, and Parker answered Plaintiffs' Amended Complaint.  (ECF Nos. 49–56, 81, 90.)  But

Defendants Bonner and Shelby County moved to dismiss under Federal Rule of Civil Procedure

8.  (ECF Nos. 45, 46.)  And Defendant Shelby County moved to dismiss under Rule 12(b)(6).

(ECF No. 107.)  The Court discusses each of these motions.[4]

## RULE 8 MOTIONS TO DISMISS

### I.    Legal Standard

Federal Rule of Civil Procedure 8 requires a complaint to include "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

And after the Supreme Court rulings in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009), this pleading requirement means that "[a] plaintiff must

now plead enough facts to 'allow[] the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged.'"  *Kensu v. Corizon, Inc.*, 5 F.4th 646, 650 (6th Cir. 2021)

(citation omitted).  Though motions to dismiss under Rule 8 typically challenge a pleading for

including too little information, they may be appropriate if the pleading contains too much

factual content as well.  *See id.*

When considering whether there is enough excess material in a pleading to support a

dismissal, courts look beyond length alone.  *Id.* at 651 ("So, while excessive length may indicate

a lack of requisite concision and simplicity, it cannot be the sole factor justifying dismissal.");

---

[4] As noted above, Bonner and Fields also moved to dismiss under Rule 12(b)(6).  (*See* ECF Nos. 76, 102.)  But the Court will address those motions by separate order.

*see also Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 518–20 (6th Cir. 2006) (affirming a
Rule 8 dismissal when the district court "considered both length and complexity [of the
Complaint] as nonissues").  Rather, a complaint has too much factual content and is subject to
dismissal when it becomes unclear what claims the plaintiff alleges, depriving defendants of fair
notice about the allegations against them.  *See Kensu*, 5 F.4th at 651 (explaining that "[w]hat
Rule 8 proscribes is *obfuscation* of the plaintiff's claims" and that "[t]he key is whether 'the
complaint is so "verbose, confused and redundant that its true substance, if any, is well
disguised""" (citations omitted)); *see also Nafziger*, 467 F.3d at 518–20 (affirming a Rule 8
dismissal when "the specific Plaintiffs that [a]re bringing certain claims cannot be determined").
But even when "a complaint violates Rule 8, the appropriate remedy is rarely immediate
dismissal." *Kensu*, 5 F.4th at 652.

## II.    Analysis

Plaintiffs' Amended Complaint itself is 57 pages in length.  That is a very long
complaint.  And with its over thirty exhibits, it expands to around 400 pages.  (*See* ECF No. 37.)
Its sections introduce the case; set out jurisdiction and venue; identify the parties to the action;
provide general factual allegations about the case, the policies and procedures at the Jail, and
other incidents at the Jail; assert twenty-one separate causes of action, each with its own
subsection heading; and demand relief.  (*Id.*)  Of course, Rule 8 requires many of these sections
for a valid complaint.  *See* Fed. R. Civ. P. 8(a) (requiring plaintiff include "grounds for the
court's jurisdiction," facts showing the plaintiff "is entitled to relief," and "a demand for the
relief sought").

But Defendants Bonner and Shelby County move to dismiss under Rule 8,[5] relying heavily on out-of-circuit authority and arguing, among other things, that much of the Amended Complaint's content is unnecessary, irrelevant, immaterial, and confusing. (ECF No. 45 at PageID 1049; ECF No. 46 at PageID 1061–62.)  Plaintiffs counter with a paragraph-by-paragraph discussion of the Amended Complaint that sets out their reasons for including each section in the pleading. (ECF No. 64; *see also* ECF No. 65.)

The Court recognizes that portions of the Amended Complaint may be unnecessary or may anticipate defenses that Defendants have not asserted yet.  But having read the pleading, the Court does not find the allegations in the Amended Complaint to be so belabored or confusing that the lawsuit's claims are "obfuscat[ed]" or that its "true substance" is "disguised." *See Kensu*, 5 F.4th at 651.  This is especially true when the Amended Complaint contains clear headings for sections and subsections and separately lists each of their twenty-one claims. (*See* ECF No. 37 at PageID 637–54.)

Defendants Bonner and Shelby County argue that responding to the Amended Complaint, which alleges claims based on many legal theories against multiple defendants, is a large undertaking.  This may be true, but the Court finds that the Amended Complaint does not rise to a level of "unfairness" that is different from the inherent challenges of litigating multi-party cases of this sort.  The Court especially hesitates to find that requiring these moving Defendants to answer is unfair when the other Defendants have already done so. (*See* ECF Nos. 49–56, 81, 90.)

---

[5] Shelby County states in a footnote that the individual Defendants who had been served at the time of its motion "join in the County's instant Motion and request for relief." (ECF No. 46-1 at PageID 1064.)  Because those individual Defendants answered the Amended Complaint, the Court will still refer to the motion as Shelby County's.

For these reasons, the Court **DENIES** Defendants Bonner's and Shelby County's Motions to Dismiss under Rule 8.

<u>**SHELBY COUNTY'S RULE 12(b)(6) MOTION TO DISMISS**</u>

**I.    Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege enough facts to "state a claim to relief that is plausible on its face." *Crawford v. Tilley*, 15 F.4th 752, 762 (6th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). And the court must accept all factual allegations as true. *See id.* But it need not accept legal conclusions or make unreasonable inferences in favor of a plaintiff. *See id; Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020).

Also on a motion to dismiss, the court generally restricts its review to the face of the complaint. *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 698 (6th Cir. 2022). But the court may consider exhibits attached to the complaint, public records,[6] items that appear in the record of the case, and "exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein," without converting the motion to one for summary judgment. *Diei v. Boyd*, 116 F.4th 637, 643 (6th Cir. 2024). The Court thus considers the attachments to the Complaint in its review of the record.[7]

---

[6] Shelby County asks the Court to take judicial notice of three other cases from the Western District of Tennessee: *Selma Graham v. Shelby County, Tennessee*, Case No. 2:21-cv-02357-MSN-cgc; *Westbrook v. Bonner*, Case No. 2:23-cv-02094-SHL-atc; and *Ragland by and through Mitchell v. Shelby Cnty., Tenn.*, No. 2:22-cv-02862-SHL-atc. (ECF No. 107-1 at PageID 1973 n.26.) Because both Parties address and rely on these cases, the Court takes judicial notice of them and their public filings. (*Id.*; *see also* ECF No. 37 at PageID 613–18.)

[7] Shelby County wants the Court to consider a video from Pod E on the night of Donald's attack. Courts may consider video evidence on a motion to dismiss only if the video "blatantly contradict[s] or utterly discredit[s]" allegations in a complaint. *See Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024) (brackets and quotation marks omitted) (quoting, indirectly, *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Akima v. Peca*, 85 F.4th 416, 422 (6th Cir. 2023) ("Still, at the motion to dismiss stage we rely on the videos over the complaint only to the degree the videos are clear and blatantly contradict or utterly discredit the plaintiff's version of events."

Plaintiffs assert claims under 42 U.S.C. § 1983 against Shelby County[8] and the other

Defendants in their official and individual capacities.[9]  (ECF No. 37 at PageID 601–05, 637–51.)

Defendant Shelby County moves to dismiss the § 1983 claims, asserting Plaintiffs have failed to

plead liability under *Monell*.[10]  (*See generally* ECF No. 107-1.)  The Court now addresses Shelby

County's motion to dismiss.

## II.    Analysis

Plaintiffs may bring claims under § 1983 for "the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws" against any person, including a municipality,

acting under color of state law.  42 U.S.C. § 1983; *see also Hall v. Navarre*, 118 F.4th 749, 756

(6th Cir. 2024) ("Section 1983 authorizes an individual to bring suit against state and local

officials who deprive the individual of a federal right under color of state law."); *Coleman v.*

*Hamilton Cnty. Bd. of Cnty. Comm'rs*, 130 F.4th 593, 598 (6th Cir. 2025) ("Ever since *Monell*

---

(quotation marks omitted)).  The Court has reviewed the video and finds that it does not
"blatantly contradict" Plaintiffs' summary of events, even though there is plenty of room to
interpret the video differently.  (*Compare* ECF No. 107-2 (Jail surveillance video from the night
of November 17, 2022) *with* ECF No. 37 at PageID 610–11 (Plaintiffs' alleged timeline of
events from the night of November 17, 2022).)  For this reason, the Court does not consider the
video here.

[8] Plaintiffs also allege negligence against Shelby County under the TGTLA (ECF No. 37 at
PageID 651–54), but the County did not move to dismiss these claims (*see* ECF No. 107).

[9] No party has moved to dismiss any official capacity claim.  This decision makes sense, of
course, because official capacity claims against government employees are treated as claims
against the governmental entity—here, Shelby County.  *See Direct Constr. Servs., LLC v. City of*
*Detroit*, 820 F. App'x 417, 426 (6th Cir. 2020) ("[A]n official-capacity claim is merely another
name for a claim against the municipality." (citing, among others, *Cady v. Arenac Cty.*, 574 F.3d
334, 342 (6th Cir. 2009))).  And Plaintiffs acknowledged as much in the Amended Complaint,
explaining that their "official-capacity claims . . . are indistinguishable from their claims against
[Shelby] County as an entity and do not represent separate claims."  (ECF No. 37 at PageID
602–04.)

[10] Shelby County technically bases its motion to dismiss on Federal Rule of Civil Procedure
12(b)(6) or 12(c).  Because the standards for each are identical, *see Lindsay v. Yates*, 498 F.3d
434, 437 n.5 (6th Cir. 2007), the Court refers to it as a 12(b)(6) motion here.

[*v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)], the Supreme Court has held that the word

'person' includes municipalities . . . .").

But liability under § 1983 only extends to a municipality "when a government policy or

custom causes the deprivation of a federal right." *Hall*, 118 F.4th at 756–57 (citing *Monell*, 436

U.S. at 694). This rule requires more from a plaintiff than alleging that a municipality "employs

a tortfeasor." *Id.* at 757 (citing *Monell*, 436 U.S. at 691). Rather, the plaintiff must allege that

the municipality was the "moving force" behind the injury. *Id.* (quoting *Bd. of Cnty. Comm'rs of

Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)). A plaintiff therefore must "first allege that

[his or] her injuries arose from an unconstitutional act" and "then 'connect' that act to a county

policy or custom." *Coleman*, 130 F.4th at 599; *see also Hall*, 118 F.4th at 757 (quoting *Jackson

v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019)) (noting that a plaintiff "must identify [a]

policy, connect the policy to the c[oun]ty itself and show that the particular injury was incurred

because of the execution of that policy"). The Court discusses these steps in turn.

A.    **Violation of a Constitutional Right**

Plaintiffs claim Shelby County violated two of Donald's rights: the right to be free from

harm while incarcerated and the right to be timely released from jail at the end of a sentence.

(ECF No. 37 at PageID 637–44, 644–47; ECF No. 125 at PageID 2071–74, 2080–82.) The

Court now analyzes whether Plaintiffs have alleged violations of each right.

1.    **Failure to Protect**

Plaintiffs first assert that Shelby County violated Donald's right to be safe from harm

while incarcerated. (ECF No. 37 at PageID 637–44; ECF No. 125 at PageID 2071–74.) The

Court will address whether Donald had a right to protection that Shelby County violated,

whether Plaintiffs plausibly alleged that it violated the right with deliberate indifference, and

whether Plaintiffs can bring a claim against the County directly for its conduct related to this right.

**a.**    **Violation of the Right to Protection**

Prison detainees—such as convicted prisoners and pretrial arrestees—have a constitutional right to be safe from harm.[11]  *Coleman*, 130 F.4th at 599 ("Corrections officers must protect convicted prisoners from harm under the Eighth Amendment, and they must protect pretrial detainees from harm under the Due Process Clause." (citation omitted)).  This includes harm from other detainees.  *Id.* ("An inmate can suffer harm in varying ways.  Other detainees might assault the inmate." (citations omitted)); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (stating, in an Eighth Amendment context, that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners" (citation and internal punctuation marks omitted)).

Plaintiffs allege that, because he had served his sentence, Donald was a release-eligible detainee at the Jail.  (ECF No. 37 at PageID 605.)  And as a detainee, he had a right to protection. *See Coleman*, 130 F.4th at 599.  Plaintiffs add that Donald's cellmate strangled and killed him, meaning that Shelby County failed to protect him from harm.  (ECF No. 37 at PageID 610–12.) And so, Plaintiffs have plausibly alleged that Donald had a right to be safe in the Jail and that Shelby County violated that right by failing to protect him from his cellmate.  The next question

---

[11] The source and scope of this right varies based on the detainee's detention status.  *See Westmoreland v. Butler Cnty.*, 29 F.4th 721, 727 (6th Cir. 2022) ("[P]retrial detainees' constitutional status differs from that of convicted prisoners." (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 397–98, 400 (2015))); *id.* at 726–28 (explaining the standards for deliberate indifference under the Eighth and Fourteenth Amendments).  The Court discusses this issue in the next section.

10

is whether that failure to protect is actionable.  In other words, the question is whether Plaintiffs

plausibly alleged that the County acted with deliberate indifference.

###           b.         Deliberate Indifference

Before a municipality will be liable for violating an inmate's right to protection, a

plaintiff must also show the municipality acted with deliberate indifference.  Under the Eighth

Amendment, which protects convicted prisoners, courts review whether an actor is "deliberately

indifferent to inmate health or safety" under "an objective and subjective component."

*Westmoreland v. Butler Cnty.*, 29 F.4th 721, 726 (6th Cir. 2022) (brackets omitted).  But pretrial

detainees who rely on the protections of the Fourteenth Amendment may show deliberate

indifference "by proving 'more than negligence but less than subjective intent—something akin

to reckless disregard.'"[12]  *Id.* at 728.  In effect, this means that, to show deliberate indifference,

the Fourteenth Amendment does not require the same subjective culpability as the Eighth

Amendment.  *See id.* at 726–28.  With this in mind, the Court will next discuss how the

Amendments might apply to a release-eligible detainee.

It is unclear whether the Eighth or Fourteenth Amendment applies to a release-eligible

detainee.  A release-eligible detainee, like Donald, has served his sentence and, in this sense, is

---

[12] The Sixth Circuit identified a test for showing reckless disregard under the Fourteenth
Amendment.  It requires these four elements:

> 1) The defendant made an intentional decision with respect to the conditions under
> which the plaintiff was confined;
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
> (3) The defendant did not take reasonable available measures to abate that risk,
> even though a reasonable officer in the circumstances would have appreciated the
> high degree of risk involved—making the consequences of the defendant's conduct
> obvious; and
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Westmoreland*, 29 F.4th at 729.

no longer subject to punishment for criminal conduct. *See id.* at 727–28 (explaining that the Supreme Court in *Farmer* "adopted the subjective component of the test for deliberate indifference under the Eighth Amendment *based on the language and purposes of that amendment*, focusing particularly on 'punishments.'"). That said, one could argue that release-eligible detainees also lack the presumption of innocence that accompanies a pretrial arrestee. So a release-eligible detainee's due process rights in jail may still be less than those afforded to someone who has not been convicted of a crime. *See Morgan v. Wayne Cnty.*, 33 F.4th 320, 323, 326 (6th Cir. 2022) (applying the Eighth Amendment standard to someone who "was both a pretrial detainee (on the assault of a prison officer charge) and a convicted prisoner (on the unrelated charge)" but was still serving her sentence for the unrelated charge).[13] For now, the Court declines to answer the question of which Amendment protected Donald in the Jail because Plaintiffs' allegations survive dismissal under either standard. And so the Court will apply the more onerous Eighth Amendment rule here.[14]

To survive dismissal on a failure to protect claim under the Eighth Amendment, a plaintiff must allege that the municipality was "deliberately indifferent to inmate health or safety." *Westmoreland*, 29 F.4th at 726. In the Sixth Circuit, this requires both objective and subjective factors:

> Under the objective component, "[f]or a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." The subjective component requires an inmate to

---

[13] That a detainee has indefinitely lost his presumption of innocence seems to be a slippery slope. At what point does a convicted inmate who has served his sentence regain the presumption of innocence that a pretrial detainee would have?

[14] Though the Court does not decide whether the Eighth or Fourteenth Amendment applies to Donald right now, this issue may be relevant later. Thus, heeding the guidance of *Westmoreland*, which emphasized that "*the language and purposes of*" the Amendments reflect the rights to which "constitutionally distinct groups" of detainees are entitled, the Court will enter a separate order requiring the parties to submit supplemental briefing on this question.

show that the individual defendants (1) were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (2) actually drew the inference; and (3) consciously disregarded the risk.

*Id.* at 726–27 (citations omitted).

Plaintiffs argue here that the County's staffing and supervision decisions[15] showed deliberate indifference toward Donald's safety.  They allege that the Jail had especially high rates of inmate-on-inmate violence (ECF No. 37 at PageID 631–34), had staff vacancies on the night of Donald's death (*id.* at PageID 607, 625), and employed a supervision system by which parts of the Jail went unmonitored for extended periods (*id.* at PageID 607–13, 622–27).  Plus, the Jail allegedly knew that Donald faced a particular risk: his cellmate, whose criminal record included murder, threatened to kill him.  (*Id.* at PageID 606–10.)  These facts, which the Court accepts as true, all show that inmates at the Jail, including Donald, objectively faced a "substantial risk of serious harm" from other inmates—despite their constitutional right to be protected from such harm.  *See also Farmer*, 511 U.S. at 833 ("[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." (internal punctuation omitted)).

Plaintiffs have also alleged facts supporting each element of the subjective prong for deliberate indifference.

### i.    Aware of Facts from Which to Infer Risk of Harm

First, Plaintiffs have plausibly alleged that the County was "aware of facts" that its staffing levels and supervision model posed substantial risks to detainees.  Plaintiffs cite prior investigations, lawsuits, and incidents of inmate deaths and injuries as well as statistics about the Jail's rates of inmate-on-inmate violence.  (ECF No. 37 at PageID 613–20, 625–27, 631–34.)

---

[15] The Court will discuss whether these alleged decisions are "policies" and "customs" for purposes of *Monell* liability and whether Plaintiffs can connect Donald's constitutional harm to them in a later section.

And the County could allegedly infer from these facts that its current operations created a
substantial risk of serious harm to detainees.

Shelby County counters that the prior incidents and controversies are too remote or
dissimilar to be "facts from which" it could "infer[]" that inmates face a risk of harm under its
staffing and supervision practices.  *See Westmoreland*, 29 F.4th at 726–27 (citations omitted).
To be sure, some of these alleged facts have limited probative value on this point.  For example,
the Department of Justice investigation occurred over twenty years ago (*see* ECF No. 37 at
PageID 619 (stating the investigation issued its report in 2001)), and the timing and details
related to the other cited incidents vary (*see id.* at PageID 613–18 (outlining incidents involving
inmates Demarcus Jarrett, Cordero Ragland, and Antonio Davis)).  Even so, resolving reasonable
factual inferences in Plaintiffs' favor as the Court must, Plaintiffs have plausibly alleged that
Shelby County was aware of these facts.  And being aware of these facts, the County plausibly
could have inferred that its staffing levels and supervision practices created a substantial risk that
detainees would suffer serious harm from other inmates.

Similarly, Plaintiffs allege that "Bonner, Fields, and other County policymakers"
attended Shelby County's Jail Compliance Committee meetings, which discussed "the disturbing
trends in inmate assaults."  (*Id.* at PageID 627–28.)  They also allegedly attended "confidential
mortality review meetings," which addressed "specific inmate deaths."  (*Id.*)  And Shelby
County policymakers, including County Commissioners and the Shelby County Mayor, received
monthly "Jail Report Cards" that "report the number of in-custody incidents (including inmate
assaults and death), reflect staffing patterns, and . . . [provide] notice of the disturbing trends" in
these areas.  (*Id.* at PageID 635.)  And so, the Court finds that Plaintiffs have plausibly alleged
that Shelby County policymakers were "aware of facts" of high and increasing inmate assault

14

and death rates "from which the inference could be drawn that" other inmates, like Donald, faced a "substantial risk of serious harm" in the jail. *See Westmoreland*, 29 F.4th at 726.

As a result, Plaintiffs' claims survive dismissal under the first subjective element for deliberate indifference.

### ii.    Inference

Not only have Plaintiffs plausibly alleged that Shelby County *could have drawn an inference* that its jail staffing and supervision policies placed detainees at a substantial risk of harm, but they have also plausibly alleged that the County "actually drew the inference." *See id.* Indeed, they have plausibly alleged that Shelby County knew the risk of harm that inmates faced (ECF No. 37 at PageID 613–20, 625–28, 631–35) and that the County had vacant and unstaffed corrections officer positions (*id.* at PageID 607, 625). They also allege that Shelby County modified its staffing and supervision models based on earlier conditions at the Jail, suggesting that Shelby County actually inferred that those practices impacted violence levels in the Jail. (*See id.* at PageID 619–21, 624.) This is all the more plausible given that Plaintiffs also alleged that, as recently as 2020, an independent expert informed Shelby County that its staffing levels and supervision protocols risked harm to inmates. (*Id.* at PageID 625–27.)

### iii.    Conscious Disregard

The final subjective element for deliberate indifference is whether Plaintiffs plausibly alleged that Shelby County consciously disregarded the risk its detainees faced under its staffing and supervision regimes. *See Westmoreland*, 29 F.4th at 726–27 (citations omitted). Plaintiffs allege that, in December 2021, the Jail "continued to house inmates at the Jail despite *eighty-five* vacant guard postings per shift." (ECF No. 37 at PageID 625.) Shelby County counters that these are not intentional decisions but unfortunate circumstances that it would remedy if it could

15

find qualified applicants.  But this begs the question why Shelby County decreased its budget for the Jail in recent years.  (*Id.* at PageID 621.)  And it again adjusted the Fiscal Year 2022 County Budget to reallocate $2,900,000 "from the SCSO Personnel Fund to its Operations and Maintenance Fund."  (*Id.*  at PageID 635–36.)[16]  Plaintiffs claim that same budget "took away an additional twenty-two guard positions from the Jail."  (*Id.* at PageID 636.)

By the time Donald died near the end of 2022, "the deathrate inside the Jail [had] more than tripled" since 2019.  (*Id.* at PageID 631.)  And the "number of total assaultive offenses" increased by 44% in that same time.  (*Id.*)  What is more, the rates of inmate-on-inmate violence at the Jail continued to surpass those of other detention facilities.[17]  (*Id.* at PageID 632–34.) These facts, which the Court accepts as true, plausibly allege conscious disregard, even if the County may be struggling to fill some of its vacancies.

For these reasons, Plaintiffs have plausibly alleged the objective and subjective elements to show deliberate indifference under the Eighth Amendment.  As a result, Plaintiffs' failure to protect claim survives dismissal if Plaintiffs connect this violation to a County policy or custom.

### c.    Claims Directly Against Shelby County

Shelby County argues that Plaintiffs cannot "make out a failure to protect claim directly against a municipal entity, without any intervening municipal employee actor." (ECF No. 128 at PageID 2092.)  But that is not entirely true.  To be sure, "[i]n many cases, a finding that no individual defendant violated the plaintiff's constitutional rights will also mean that the plaintiff

---

[16] It is unclear whether the Fiscal Year 2022 budget is evidence of conscious disregard because it would have gone into effect after Donald's death.  (*See* ECF No. 76-1.)  Even so, the 2017 budget decisions predate Donald's death, are probative on this issue, and can plausibly show conscious disregard.  (*See* ECF No. 37 at PageID 621.)

[17] The Court recognizes that the comparators Plaintiffs cite here may not be particularly analogous facilities.  But at the motion to dismiss stage, the Court finds the comparison useful.

has suffered no constitutional violation." *Grote v. Kenton Cnty.*, 85 F.4th 397, 414 (6th Cir. 2023) (citation omitted)[18]; *see also Westmoreland*, 29 F.4th at 731 ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." (citation omitted)).  This makes sense in the context of an excessive force claim accusing a municipal police officer and department of a § 1983 violation.

But the Sixth Circuit has also "note[d] that it is proper to consider possible constitutional violations committed by a municipality *qua* municipality, even in the absence of a showing of a constitutional violation by any one individual officer." *Grote*, 85 F.4th at 414.  Thus, there may be "a finding of municipal liability even if no individual officer violated the Constitution where constitutional harm has nonetheless 'been inflicted upon the victim' and the municipality is responsible for that harm." *Id.*; *see also Arrington-Bey v. Cty. of Bedford Heights*, 858 F.3d 988 (6th Cir. 2017) (comparing the analysis for failure-to-train cases in which "an injury arises directly from a municipal act" and "fault and causation obviously belong to the [municipality]" with cases in which "a municipality's alleged responsibility for a constitutional violation stems from an *employee*'s unconstitutional act").

Donald has plausibly suffered a harm of constitutional proportion here.  According to the Complaint, he was a release-eligible detainee (with either Eighth or Fourteenth Amendment

---

[18] Shelby County argues that *Grote* is merely dicta.  And Judge Lipman called it as much in *Ragland by and through Mitchell v. Shelby County, Tennessee*, No. 2:22-cv-2862-SHL-atc, 2024 WL 3444625, at *5 (July 17, 2024).  But this Court is not so sure.  The Sixth Circuit set out the rule, applied it, and decided the case.  *See Grote*, 85 F.4th at 414 ("Rightfully, the parties, as well as the district court, did not simply conclude that Kenton County is not liable despite the lack of a constitutional violation by any individual defendant.  Applied here, Grote fails adequately to show that Kenton County is liable under *Monell*.").  Though it could have decided the case on other grounds, which would have turned the discussion on this issue into dicta, this Court's reading of *Grote* is that it did not.  *See id.*  Even more to the point, however, is that even if the analysis in *Grote* is not binding precedent, the Court finds it persuasive here and also finds the requirement of individual employee action inapplicable under these facts.

17

protections) who was murdered in his cell without any immediate response from corrections

officers.  (ECF No. 37 at PageID 605–12.)  And, as discussed below, Plaintiffs allege that the

municipality, through its policies and customs, is responsible for that harm.  What is more,

Plaintiffs plausibly identify an individual actor here.  For instance, even though Plaintiffs claim

that the Jail's policies were deliberately indifferent toward and violated Donald's right to safety,

Plaintiffs also claim that individual policymakers at Shelby County had to adopt those policies.

(*See id.* at PageID 624 ("After Bonner took office, he, Fields, or some other person holding final

policymaking authority for the County with respect to Jail staffing patterns, eliminated guard

postings inside the cell pods.").)[19]

The Court thus finds Plaintiffs have plausibly alleged that Shelby County, through its

staffing and supervision decisions, failed to protect Donald, a release-eligible detainee, in

violation of his constitutional right to be free from harm.  The Court now discusses Plaintiffs'

claim that Shelby County also violated Donald's right to timely release.

### 2.    Failure to Timely Release

Plaintiffs next assert that Shelby County violated Donald's Eighth and Fourteenth

Amendment rights to timely release from jail by failing to effectively process him "at the end of

his imprisonment."  (ECF No. 125 at PageID 2080 (quoting *Shorts v. Bartholomew*, 255 F.

App'x 46, 59 (6th Cir. 2007)); *see also* ECF No. 37 at PageID 644–47.)  The Court will first

---

[19] Plaintiffs also sued 13 people in their individual and official capacities for their actions
contributing to Donald's death.  (ECF No. 37 at PageID 602–04.)  And so, Shelby County's
argument that there was only entity-level conduct without any individual conduct from
employees mischaracterizes the facts Plaintiffs allege here.  If the corrections officers followed
the Jail's policies and thus left Donald vulnerable to harm from his cellmate, it is plausible that
Shelby County, through its employees, failed to protect Donald.  And it is plausible that they did
so with deliberate indifference given their alleged knowledge about the threats Donald faced
from his cellmate.  (*See id.* at PageID 606–10.)

explain the right to release and then address whether Plaintiffs have alleged that Shelby County

violated that right with deliberate indifference.

### a.    Violation of the Right to Release

A prisoner has a right to be released within a reasonable time after his or her sentence

ends.[20]  *Cf. Baker v. McCollan*, 443 U.S. 137, 142 (1979) (identifying the issue as whether a

"prolonged detention caused by petitioner's failure to institute adequate identification

procedures" violated the "Fourteenth Amendment's protection against deprivations of liberty

without due process of law"); *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991) (holding

that an unreasonable delay of more than 48 hours in making a probable cause determination was

unconstitutional).  Even so, having that right does not automatically make Donald's hours-long

delay in release a constitutional violation.  Simply put, a jail needs time to administratively

process detainees for release, and not all delays resulting from these efforts will violate a

detainee's rights.  *See, e.g.*, *Brass v. Cnty. of Los Angeles*, 328 F.3d 1192, 1200 (9th Cir. 2003)

(finding that a 39-hour delay in release was not unconstitutional).

Plaintiffs acknowledge as much, conceding that "practical administrative considerations

might justify some flavor of a mandatory, post-disposal return for processing."  (ECF No. 37 at

PageID 630.)  In fact, a two- or twelve- or even twenty-hour delay may be permissible depending

on the circumstances, such as the jail's release procedures, the conditions of the detainee's

confinement, the number of detainees at the facility, or the notice the jail receives about a

---

[20] The right to release from custody is not absolute, and its exact contours are somewhat vague.
*See Jones v. Bottom*, 85 F.4th 805, 811 ("*Jones II*") (in the context of deciding whether the right
to timely release is "clearly established," noting that the right "has shaky underpinnings.  For one
thing, it strikes at a high level of generality, something case law frowns upon.  For another, it
was justified by a single citation to an unpublished decision . . . ." (citations omitted)).  Even so,
for purposes of this analysis in which the "clearly established" question is not before the Court,
this right exists to some degree.

detainee's eligibility for release. *See Brass*, 328 F.3d at 1200. And any sweeping assertion that Donald's right was automatically violated here simply because he was not released on November 17—which is how Shelby County couches Plaintiffs' position (*see* ECF No. 107-1 at PageID 1973–74 ("Plaintiffs simply assume that there is some unspecified constitutional right to a particular release time here."))—would overstate the law.

But the Court views Plaintiffs' position differently. True, they claim that Donald was detained longer than his sentence. They allege Donald became release-eligible on November 17, 2022, when the state court sentenced him to less time than he had already served. (ECF No. 37 at PageID 605 (alleging that, after six months in jail, Donald received a five-month sentence).) And then they allege that he was not released that day and was, instead, forced to remain in custody for another night. (*Id.* at PageID 606–07.)

But they also claim that the County detained Donald for *longer than it needed to*. (*Id.* at PageID 629–31 (alleging the Jail "has unreasonably held inmates in custody for extended, unnecessary periods of time"; that the process averages more than ten hours—even though "SCSO represents publicly that, on average, it takes less than two hours to process out an inmate"; and that the Jail lacks "legitimate administrative or penological objective[s]" for the delay).) And this latter claim makes it plausible that holding Donald another night did violate his rights. Discovery may reveal that the County had reasonable justifications for the delay, thus nullifying concerns that the over-detention was impermissible. But at this stage, the Court accepts Plaintiffs' allegations as true and finds they have plausibly alleged a violation of the constitutional right to release under these circumstances.

**b.      Deliberate Indifference**

The next issue is whether Plaintiffs plausibly alleged that Shelby County violated

Donald's right to release with deliberate indifference.  To show deliberate indifference in the

over-detention context, a plaintiff must allege the defendant "(1) had knowledge of the risk that

an unwarranted punishment was being inflicted on [the plaintiff] and (2) failed to act or took

only ineffectual action under the circumstances; and (3) whether there is a causal connection

between [the defendant's] conduct and [the plaintiff's] allegedly unwarranted punishment."

*Jones v. Bottom*, 85 F.4th 805, 811 (6th Cir. 2023) ("*Jones II*") (citing reference omitted); *see

also Shorts*, 255 F. App'x at 55.  In sum, deliberate indifference "requires knowledge, failure to

act, and causation."  *Jones II*, 85 F.4th at 814.

As to the first element, Plaintiffs allege that Shelby County knew Donald was release-

eligible because he informed corrections officers that his sentence was over, because he

requested to be taken to "check out" for out-processing, and because the Jail had "immediate"

access to his judgment and sentence.  (ECF No. 37 at PageID 605–06.)  Plaintiffs thus plausibly

allege that Shelby County knew that failing to release Donald risked inflicting "an unwarranted

punishment" of over-detention on him.[21]

As for the second element, Plaintiffs allege that the officers failed to respond to Donald's

pleas for release.  (*Id.* at PageID 606.)  In fact, rather than processing him out, they allegedly

---

[21] To the extent that Plaintiffs argue that the over-detention exposed Donald to the "unwarranted
punishment" of inmate-on-inmate violence, the Court does not find a connection between that
harm and the County's customs.  (*See* ECF No. 37 at PageID 631 ("Long before November
2022, the Jail's refusal to release inmates within a reasonable amount of time following release
eligibility subjected those young men to the substantially increased risk of violence present in the
Jail."); *see also* ECF No. 128 at PageID 2091 ("Plaintiffs do not even attempt to ascertain or
establish a causal connection other than to say that Mr. Donald was assaulted after he—in their
unilateral view—should have been released and, therefore, the failure to release must have
caused the alleged harm.").)

"ignored him" and misleadingly brought him out of the holding cell "as if he were finally checking out" before placing him in a different cell overnight. (*Id.* at PageID 606.) In response to Donald's comments that he was release-eligible and feared for his life, one staff member failed to assist and instead stated that the concerns "ain't got shit to do with me. I ain't coming to work tomorrow no way." (*Id.* at PageID 607.) In short, the Court finds that Plaintiffs plausibly allege that Shelby County "failed to act or took only ineffectual action" to facilitate his release and avoid unwarranted detention. *See Jones II*, 85 F.4th at 811.

Finally, Plaintiffs assert that it was Shelby County's failure to respond to Donald's eligibility for release—whether by confirming the status of his sentence or beginning to process him out—that resulted in his unnecessary, prolonged detention. (*See* ECF No. 37 at PageID 629–31.) In fact, Plaintiffs allege that Donald remained in custody for over ten hours[22] even though the Jail itself states that out-processing takes an average of only two hours. (*Id.* at PageID 605–07, 630.) Plaintiffs therefore plausibly meet the third requirement for causation: Shelby County's passivity and inaction toward releasing Donald allegedly caused him to suffer an unwarranted and prolonged detention.

In sum, Plaintiffs have plausibly alleged deliberate indifference. Shelby County, through its employees, knew that failing to timely respond to and release Donald exposed him to a risk of unwarranted over-detention, but they still did not process him out.

### B.    Connecting the Injury to a Policy or Custom

Having found that Plaintiffs have plausibly alleged violations of two constitutional rights, the Court next addresses whether Plaintiffs plausibly connect either of these violations to a

---

[22] As noted above, it remains to be seen whether a ten-hour delay is unreasonably long. But under these allegations, it is at least plausibly unreasonable.

Shelby County policy or custom. *See Coleman*, 130 F.4th at 599 (requiring a plaintiff "first allege that [his or] her injuries arose from an unconstitutional act" and "then 'connect' that act to a county policy or custom"). Under this second requirement for *Monell* liability, a plaintiff "must do more than show" a constitutional violation and must also "prove that the violation arose from one of [the c]ounty's policies or customs." *Id.* at 599–600. The Sixth Circuit recognizes four ways to show a municipal policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 323 (6th Cir. 2023) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)); *see also Mosier v. Evans*, 90 F.4th 541, 548 (6th Cir. 2024). In this vein, Plaintiffs allege that Shelby County has policies and customs within the first and fourth of these categories. (*See* ECF No. 37 at PageID 637–45 (alleging unconstitutional policies and tolerance).) The Court will first address the alleged illegal policies and then Plaintiffs' allegations of custom.

### 1.    Policies of Understaffing and Indirect Supervision

One way for a plaintiff to show municipal liability is to allege "the existence of an illegal official policy or legislative enactment." *Helphenstine*, 60 F.4th at 323. But when "the policy at issue ha[s] no facially illegal aspects," there are "much more difficult problems of proof" than in "settings where the municipality's decision is itself unconstitutional." *Hall*, 118 F.4th at 757. In cases without a facially unconstitutional policy, the municipality must have acted "with 'deliberate indifference' as to [the] known or obvious consequences" of its action. *See id.* at 757–58 (quoting *Bryan Cnty.*, 520 U.S. at 406–07).

23

Deliberate indifference is a heavy burden and requires showing "prior unconstitutional conduct demonstrating" the defendant had notice that its conduct was deficient and "likely to cause injury but ignored it." *Jackson*, 925 F.3d at 836. Or a plaintiff could show "evidence of a single violation of federal rights, accompanied by a showing that the [municipality] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Id.* Put another way, deliberate indifference exists when "the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy [is] plainly obvious." *Id.* (citation and quotation marks omitted); *see also Payne v. Sevier Cnty.*, 681 F. App'x 443, 447 (6th Cir. 2017) (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005); *Connick v. Thompson*, 563 U.S. 51, 64 (2011)) (requiring the plaintiff to show "prior unconstitutional actions" taken under the policy or "that a policy's 'unconstitutional consequences' should have been 'patently obvious' to the county").

Plaintiffs allege that Shelby County's policies violated Donald's right to protection as a detainee. They allege the County adopted official policies of understaffing and indirect supervision through "alter[ing] the Jail's staffing patterns" by eliminating or reclassifying guard posts. (ECF No. 37 at PageID 637–38, 638–39.) They also claim that Shelby County has an official policy of understaffing because its Standard Operating Procedures for Roster Management require "a certainty—rather than a likelihood—of inmate injury or death" to make "temporary staffing-pattern revisions." (*Id.* at PageID 640–41.) And finally, Plaintiffs allege that the "total staffing deficits per shift" and failure to revise "the clearly ineffective post-specific policy" is an official policy of understaffing and lack of supervision. (*Id.* at PageID 641–42.) Although these claims are not identical, they all refer to the County's staffing and supervision

24

policies.  And the Parties analyze them together, so the Court sees no reason for a different
approach at the motion to dismiss stage.[23]

     To support its claim that Shelby County has official policies of understaffing and using
indirect supervision in the Jail, Plaintiffs turn to the Jail's Standard Operating Procedures.  They
allege that these procedures set out how corrections officers will patrol the Jail through a "post
system."  Under this system, say Plaintiffs, Shelby County has identified "fixed," "pull," and
"shutdown" posts which all require different staffing practices.  (*See id.* at PageID 622–23.)
"Fixed" posts "must be manned" and are critical "to the operation and safety of the facility, staff
and inmates."  (*Id.* at 622 (quoting the Jail's Standard Operating Procedure 200.03).)  But "pull"
posts "may be left vacant for part of a shift" and "shutdown" posts "may be left vacant for an
entire shift."  (*Id.* at 623 (quoting the Jail's Standard Operating Procedure 200.03).)  According
to Plaintiffs, the County's staffing patterns are not subject to temporary revision "based on
population safety concerns" unless it is certain "inmates will be injured."  (*Id.* (quoting the Jail's
Standard Operating Procedure 200.19).)

     Of course, identifying staff posts and designating them as "fixed," "pull," or "shutdown"
is not "facially illegal."  *See Hall*, 118 F.4th at 757.  But Plaintiffs claim that these staffing and
supervision policies are causally connected to Donald's alleged constitutional violation, asserting
that this post system exposed him, and other inmates, to unconstitutional harm.  For example,
Plaintiffs allege that, given the low number of staff on duty, their placement cannot safely

---

[23] Plaintiffs emphasize that each claim relies on a distinct theory, but they do not analyze them
separately.  (*See* ECF No. 125 at PageID 2061–62, 2069–28 (criticizing Shelby County for a
"hand-wavy summation of the Amended Complaint's several theories" and for "roll[ing] up
Plaintiffs' several separate theories into one" but providing only one generalized analysis).)
Plaintiffs' failure to provide separate analyses provides the Court with little guidance about how
each claim or theory differs, and the Court will not create Plaintiffs' arguments for them.

monitor the number of inmates in the Jail.  (ECF No. 37 at PageID 625–27.)  In fact, Plaintiffs

allege that "[t]he command stations the County had installed inside the cell pods sat empty."  (*Id.*

at PageID 624.)  And the Jail allegedly had not implemented protocols for more frequent security

rounds and constant control room monitoring even though it had adopted policies for those

changes.  (*Id.* at PageID 624–65.)

Similarly, Plaintiffs allege that the indirect supervision model that the County unofficially

adopted cannot ensure inmate safety.  (*Id.* at PageID 618–21 (explaining how, in the past,

indirect supervision "subjected inmates to an unconstitutionally high risk of violence from other

inmates").)  And so, by alleging that the County adopted policies, protocols, and staffing

practices which it plausibly knew would not ensure inmate safety but would instead expose

inmates to a risk of harm, Plaintiffs have alleged deliberate indifference toward the "patently

obvious" "unconstitutional consequences" of inmate harm.  *See Connick*, 563 U.S. at 64.

Shelby County seeks to sever this causal link by explaining that its corrections officers

knew about the threats to Donald and still did nothing.  (ECF No. 107-1 at PageID 1964–65.)  It

follows, Shelby County argues, that the attack did not occur because of the lack of staff but

because of the staff's inaction.  (*Id.*)  The Court disagrees for two reasons.  First, as Plaintiffs

point out, "for all the Jail's problems, the assumption that its ranks lack generally competent and

conscientious actors simply does not track."[24]  (ECF No. 125 at PageID 2078.)  Under the

County's theory, the Jail employs people who are unable or refuse to fulfill the duties of their

employment.  The County seems to ignore that its employees undergo training, follow specific

protocols, and are subject to disciplinary action for failing to comply with these requirements.

---

[24] In any case, the Court doubts whether an incompetency defense is better than a limited-resources one.

*See, e.g.*, ECF No. 37-5 (incident report for the attack on Donald that was "referred to disciplinary for further actions"); ECF No. 37-7 (Shelby County Sheriff's Office medical emergency procedures and requirements); ECF No. 37-21 (Jail's Standard Operating Procedures setting out roster management at the Jail); *see id.* (defining "Training" and "Training Report" as related to employee training requirements and status).

Second, it is plausible that having more corrections officers or supervisors would have allowed Shelby County corrections staff to better address the threats to Donald's safety.  For example, additional staff may have been able to move Donald to a new cell, patrol his cell block more often, or respond more effectively to the scene when Robinson attacked him in Pod E.  It is plausible that the corrections officers on duty that night, along with the added staff Plaintiffs allege should have been there, would have deterred or stopped the attack.

Or had the County assigned corrections officers to fill the empty guard posts for the night, it is plausible that they would have responded to Donald's plight sooner.  After all, Plaintiffs allege that other inmates tried to summon corrections officers by waving arms, t-shirts, and blankets in front of cameras and walkways by which officers were supposed to patrol every fifteen minutes.[25]  (ECF No. 37 at PageID 610–11.)  The inmates allegedly banged and kicked cell doors while yelling for help for forty minutes.  (*Id.* at PageID 608.)  But nobody came for over an hour.  (*Id.* at PageID 609.)  Whether this stems from too few staff members, poor

---

[25] Defendant emphasizes that failing to patrol on schedule is merely negligence insufficient for deliberate indifference.  This may be true.  *See Hyman v. Lewis*, 27 F.4th 1233, 1237–38 (6th Cir. 2022) (reasoning that failing to make rounds every 30 minutes under the jail's operating procedures was not "intentionally ignor[ing]" the inmate's needs and was not deliberate indifference).  But it does not mean that having more staff members or a system of permanent, non-patrolling corrections officers in cell blocks would not have deterred the attack on Donald or at least allowed a more efficient response.  These alleged policies of understaffing and under-supervision thus challenge more than a single correction officer's negligence in completing her assigned rounds.

supervision protocols, or correction officer incompetence or negligence is not for the Court to

decide on a motion to dismiss.  At this stage, the Court must accept Plaintiffs' factual assertions

as true.  Doing so, the Court finds it plausible that the County's staffing or supervision policies

were the moving force behind the violation of Donald's alleged right to be free from harm.

In sum, Shelby County plausibly knew that different staffing and supervision practices

were necessary for inmate safety, and failing to implement those practices plausibly resulted in

harm to inmates at the Jail.  And so, there is a plausible violation of the right to protection,

deliberate indifference toward that right, and a causal link between the staffing decisions and

Donald's harm.  As a result, Plaintiffs have plausibly alleged *Monell* liability for a violation of

Donald's right to be free from harm here.

### 2.    Customs of Tolerance

Plaintiffs next allege that Shelby County followed two customs of tolerance that violated

Donald's rights.  (ECF No. 37 at PageID 642–45.)  When there is no illegal formal policy, a

plaintiff may allege "a particular custom or practice that 'although not authorized by written law

or express municipal policy, is so permanent and well settled as to constitute a custom or usage

with the force of law.'" *Jones v. Muskegon Cnty.*, 625 F.3d 935, 946 (6th Cir. 2010) (quoting

*McClendon v. City of Detroit*, 255 F. App'x 980, 982 (6th Cir. 2007) (internal quotation marks

and citation omitted)).  To survive dismissal on a municipal liability claim under an "inaction"

theory,[26] such as a custom of tolerance, Plaintiffs must allege: (1) a "clear and persistent pattern"

of unconstitutional conduct; (2) that the County had actual or constructive notice of it; (3) that

the County "tacit[ly] approv[ed] of the unconstitutional conduct, such that [its] deliberate

---

[26] Plaintiffs here allege "inaction" because they claim that Shelby County failed to institute
procedures and practices that keep inmates safe or that release inmates from detention timely.

indifference in [its] failure to act . . . amount[s] to an official policy of inaction"; and (4) that the

custom was the "'moving force' or direct causal link" behind the violation. *Doe v. Claiborne*

*Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996); *see Ragland by and through Mitchell v. Shelby Cnty.,*

*Tenn.*, No. 2:22-cv-2862-SHL-atc, 2024 WL 3444625, at *5 (July 17, 2024).  In these cases, "[a]

plaintiff cannot establish a custom solely by pointing to the facts of his own case.  Instead, he

must 'reach beyond' the alleged misconduct at issue, and show 'several separate instances' of

similar misconduct." *Payne*, 681 F. App'x at 446 (quoting *Thomas v. City of Chattanooga*, 398

F.3d 426, 433–34 (6th Cir. 2005)).

Counts Five and Six allege unconstitutional customs of tolerance based on Shelby

County's inaction.  The Court will first analyze Count Five, which alleges a violation of

Donald's right to be free from harm, and will then address Count Six, which alleges a violation

of the right to release.  (ECF No. 37 at PageID 642–45.)

### a.    Violating Right to Protection

In Count Five, Plaintiffs allege that Shelby County had a custom of tolerance for "the

Jail's gross understaffing by continuing to house largely unsupervised inmates without

increasing the number of guards or the level of inmate monitoring and supervision."  (ECF No.

37 at PageID 642–44.)  And the County's failure to fix the Jail's overcrowded and understaffed

condition is the basis of their "inaction" argument.

To make this claim, Plaintiffs must allege: (1) a "clear and persistent pattern" of inmate-

on-inmate violence; (2) that the County had actual or constructive notice of this violence; (3) that

the County "tacit[ly] approv[ed] of the unconstitutional conduct, such that [its] deliberate

indifference in [its] failure to act . . . amount[s] to an official policy of inaction"; and (4) that the

custom was the "'moving force' or direct causal link" behind the constitutional violation.
*Claiborne Cnty.*, 103 F.3d at 508; *see Ragland*, 2024 WL 3444625, at *10.

First, Plaintiffs have plausibly alleged a "clear and persistent pattern" of inmate-on-
inmate violence here. They point to increasing rates of reported violence between inmates (ECF
No. 37 at PageID 627–28) and to the Jail's unnaturally high rates of violent incidents (*id.* at
PageID 632–34). They also allege facts about the December 2021 death of Cordero Ragland,
whose cellmate beat him to death with a pillowcase stuffed with a concrete brick.[27] (*Id.* at
PageID 615–16.) Given these allegations of violence, which Plaintiffs argue arise from Shelby
County's failure to address its staffing and supervision procedures, they have plausibly alleged
both a "clear and consistent pattern" of, and "several separate instances" of, inmate-on-inmate
violence. *See Claiborne Cnty.*, 103 F.3d at 508; *Thomas*, 398 F.3d at 434.

Second, Plaintiffs allege that they meet the notice requirement for liability. As discussed
above, Plaintiffs plausibly allege that Shelby County policymakers, Bonner, and Fields had
"notice" of the escalating Jail violence through committee meetings and reports. (ECF No. 37 at
PageID 627–28, 631–35.)

Third, the County must have "tacit[ly] approv[ed] of the underlying unconstitutional
conduct such that its deliberate indifference can be said to amount to an official policy of
inaction." *Claiborne Cnty.*, 103 F.3d at 508. Plaintiffs have plausibly alleged this element. As
discussed above, on the staffing front, Plaintiffs allege an unofficial custom of understaffing the

---

[27] Shelby County argues that Ragland's death is not a strong comparator to the facts here. But,
for purposes of this analysis, the Court disagrees. According to the Complaint, Ragland, like
Donald, died because his cellmate attacked him. (ECF No. 37 at PageID 615–16.) And the
increased presence of more corrections officers potentially could have prevented both deaths.
(*See id.*) And so, where both the cause and solution to the harms suffered are allegedly the same,
the Court thinks the case is probative.

Jail. (ECF No. 37 at PageID 642–44.) After all, the County tolerated the Jail's staffing levels (*id.*) despite the rise in inmate-on-inmate violence (*see id.* at PageID 631–34. And it failed to modify its post designations in response to the increased violence. (*Id.* at PageID 622–23.) In fact, it even decreased the Jail's budget, which decreases the number of staff members the Jail can hire to run operations and keep inmates safe. (*Id.* at PageID 621, 635–36.) Shelby County's failure to respond to or remedy the Jail's understaffed, overcrowded condition plausibly shows a "policy of inaction" and deliberate indifference toward inmate safety.

As to supervision, Plaintiffs allege that Shelby County knew that the use of indirect supervision risked physical (and unconstitutional) harm to inmates. (*Id.* at PageID 619, 625–27.) Because of these risks, Shelby County even agreed to implement a direct supervision model (*id.* at PageID 619–21), did so for some time (*id.*), and adopted policies consistent with that goal (*id.* at PageID 619–21, 624–25). But the County allegedly allowed the Jail staff to fall back into an indirect supervision model without implementing lasting reforms that would limit the harm inmates faced in custody. (*Id.* at PageID 621.) Plus, according to the Amended Complaint, Shelby County adopted guard and shift posts that could not be changed even if they posed a risk to inmate safety, and it failed to assign mandatory guard posts to cell blocks. (*See id.* at PageID 622–25.) For these reasons, Plaintiffs have plausibly alleged that the County acted with deliberate indifference toward inmate safety when it tolerated the Jail's staffing and supervision practices and failed to implement safer systems.

Fourth and finally, Plaintiffs allege that the staffing and supervision custom was the "'moving force' or direct causal link" behind the violation of Donald's right to protection. *Claiborne Cnty.*, 103 F.3d at 508; *see Ragland*, 2024 WL 3444625, at *5. They argue that, had there been more guards on duty, and had the County effectively assigned these guards to posts in

31

the Jail, Donald's cellmate would not have killed him. (ECF No. 125 at PageID 2064–65, 2076.)

As discussed above, based on the guards' failure to move Donald to a different cell, other

inmates' efforts to summon help, and the delay in responding to the situation, it is at least

plausible that this custom was the "moving force" or "direct causal link" behind his death. (*See*

ECF No. 37 at PageID 600, 606–11.)

Given the pleadings and the above analysis, Plaintiffs have plausibly alleged a custom of

staffing and supervision that violated Donald's right to protection.

### b.    Violating Right to Release

In Count Six, Plaintiffs assert their final claim against Shelby County, contending that it

had a custom of tolerance for "the Jail's conspicuous, ongoing failure to release or timely process

out release-eligible inmates." (ECF No. 37 at PageID 644–45.) For the reasons below, the Court

finds Plaintiffs have plausibly alleged this claim.

To survive dismissal, a plaintiff must allege: (1) a "clear and persistent pattern" of over-

detention; (2) that the County had actual or constructive notice of it; (3) that it "tacit[ly]

approv[ed]" of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure

to act . . . amount[s] to an official policy of inaction"; and (4) that the custom was the "'moving

force' or direct causal link" behind the violation. *Claiborne Cnty.*, 103 F.3d at 508.

For this first element, Plaintiffs have alleged that unnecessarily lengthy delays in

processing out release-eligible inmates are so common as to be a "clear and persistent pattern."

*See id.* For example, Plaintiffs assert that Shelby County had an "open tolerance for the Jail's

holding persons in custody for ten-plus hours after their release eligibility . . . ." (ECF No. 37 at

PageID 644.) And "since at least 2019," release-eligible inmates stay at the Jail "for ten or more

hours, after their cases' disposals, waiting to be 'processed out.'" (*Id.* at PageID 629.) Both

32

criminal attorneys and at least one criminal judge have allegedly accepted this practice as the norm.  (*Id.* at PageID 630.)  And this happens even though the County states that, "on average, it takes less than two hours to process out an inmate."  (*Id.* at PageID 630 (citing the Shelby County Sheriff's Office website).)

As to the second element, Plaintiffs allege that Shelby County had notice of these delays. Plaintiffs add that third parties, including attorneys and judges, and Shelby County's own corrections officers, knew about the allegedly unreasonable (and unnecessary) delays in releasing inmates.  (*Id.* at PageID 629–31.)  At minimum, it is plausible for purposes of a motion to dismiss, that Shelby County itself had actual or constructive notice of these over-detentions. And given Shelby County's position that processing out an inmate averages two hours, it is plausible that they knew these long release times were subjecting inmates to unconstitutional detentions.

Plaintiffs also meet the pleading requirements for the third element.  They allege that, by failing to timely release inmates, the County has "tacit[ly] approv[ed] of the unconstitutional" over-detentions, which have become an allegedly pervasive practice.  *Claiborne Cnty.*, 103 F.3d at 508.  And it has shown Shelby County was "deliberate[ly] indifferen[t] in its "failure to act" to fix the issue.  *Id.*  After all, inmates face ten-hour delays in processing, but the County has not abandoned its requirement for post-release detention even though, according to the Complaint, "[t]he Sheriffs of other counties in Tennessee do not impose post-disposal custody."  (ECF No. 37 at PageID 630.)  And Shelby County says the average release time is two hours, suggesting their administrative justifications require far less time than the detentions inmates face.  (*Id.*)  Yet the County has not adopted practices to release inmates consistent with that timeline.

In response, Shelby County argues that Plaintiffs cannot show deliberate indifference because they failed to allege specific inmates who have been over-detained in the past.  (ECF No. 128 at PageID 2091.)  Even so, Plaintiffs have alleged a class of individuals who suffered the same constitutional harm because of the County's same conduct—or, more precisely, lack of conduct.  (ECF No. 37 at PageID 629–31.)  The Court can, and must, infer that members of the alleged group, even if not identified by name, provided Shelby County enough notice about the obvious risk of unconstitutional over-detention that its failure to implement procedures expediting release show deliberate indifference.  If the record shows otherwise after discovery, the Court will address it later in this litigation.

Plaintiffs also plausibly allege the fourth element: causation.  But this requires clarification.  The Parties seem to focus on whether a delayed release was the "moving force" behind Donald's death—i.e., whether Donald would not have died if he had been released.  But Plaintiffs do not allege that Donald died *because he was supposed to be released* but was not.  In other words, they do not claim that Donald's cellmate killed him because he was release-eligible. In that sense, the alleged custom of over-detention was not the moving force behind Donald's death.  But the alleged custom of over-detention is the moving force behind the violation of Donald's *right to release*.  This is because failing to timely process out release-eligible prisoners *is* the constitutional violation.  Without this custom, inmates would not suffer over-detention. And with the custom, inmates cannot avoid suffering over-detention.  As a result, it is the "moving force" behind the violation.  *Claiborne Cnty.*, 103 F.3d at 508.

And so, for these reasons, Plaintiffs have plausibly alleged a custom of over-detention violating Donald's right to release.

## <u>CONCLUSION</u>

For the reasons explained above, the Court **DENIES** Defendants Bonner's and Shelby County's motions to dismiss under Rule 8.  (ECF Nos. 14, 28, 45, 46.)  And the Court **DENIES** Defendant Shelby County's motion to dismiss under Rule 12(b)(6).  (ECF No. 107.)  The Court will address Defendants Bonner's and Fields's motions to dismiss for qualified immunity and failure to state a claim by separate order.

**SO ORDERED**, this 14th day of July, 2025.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE