**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| MARILYN DONALD, as next-of-kin and wrongful death representative of the late MARCUS DONALD, in her individual capacity, and CHARLES DONALD, as next-of-kin and wrongful death representative of the late MARCUS DONALD, in his individual capacity, | ) ) ) ) ) ) ) | |
| | ) | No. 2:23-cv-02738-TLP-atc |
| Plaintiffs, | ) ) | JURY DEMAND |
| v. | ) ) | |
| FLOYD BONNER, JR., et al., | ) ) | |
| Defendants. | ) | |

**ORDER GRANTING FLOYD BONNER'S AND KIRK FIELDS'
RULE 12(B) MOTIONS TO DISMISS**

This is a tragic case about inmate-on-inmate violence in the Shelby County Jail ("Jail").

While detained at the Jail, Marcus Donald's cellmate strangled him. Donald unfortunately died a

few days later. Donald's parents, Plaintiffs Marilyn and Charles Donald, then sued Defendants

Sheriff Floyd Bonner, Jr., Chief Jailer Kirk Fields, Shelby County, T. Johnson, Dontreal

Hawkins, Kimberly Wallace, Brenda McCoy, Grandberry, and Terri Parker. (ECF No. 37 at

PageID 602–05.) Plaintiffs seek to hold these Defendants liable for their son's death under 42

U.S.C. § 1983 and the Tennessee Governmental Tort Liability Act. (*Id.* at PageID 637–54.)

Sheriff Bonner and Chief Jailer Fields now separately move to dismiss, arguing that Plaintiffs

have not stated a supervisory liability claim against them. (ECF Nos. 76, 102.) For the reasons

below, the Court **GRANTS** each Motion.

1

**BACKGROUND**

In the late morning of November 17, 2022, Donald pleaded guilty to a simple assault charge and received a five-month sentence.  (ECF No. 37 at PageID 605; ECF No. 37-2.) Because Donald had been in jail for six months, as soon as he entered the guilty plea, he became release-eligible.  (ECF No. 37 at PageID 605.)  But the Jail did not release him immediately. Rather, it placed Donald in a cell with Stephen Robinson.  (*Id.* at PageID 606.)  That night, Robinson strangled Donald, who died from his injuries a few days later.  (*Id.* at PageID 600–01, 610, 612.)

Plaintiffs assert that the Jail knew Robinson endangered Donald.  They allege that Robinson threated to kill Donald in front of corrections officers.  (*Id.* at PageID 606.)  They also allege that Donald told an officer that he feared for his life, and that other inmates did the same. (*Id.* at PageID 607–08.)  Yet no one at the Jail addressed these warnings.  (*See id.* at PageID 607–12.)  After Robinson strangled Donald, inmates in the cell block allegedly tried to flag down a corrections officer by waving toward the camera in their cell pod area, throwing personal items into the walkway, and yelling for assistance.  (*Id.* at PageID 610–11.)  But allegedly no corrections officer came into the cell pod until twenty minutes later, which was over an hour after a corrections officer last walked through the area.  (*Id.*)  The officers called an ambulance to transfer Donald to Regional One Health.  (*Id.* at PageID 611–12.)  He remained on life support until doctors declared him brain dead on November 23, 2022.  (*Id.* at PageID 612.)

Donald's parents, as next-of-kin and wrongful death representatives, sued Defendants Sheriff Floyd Bonner, Jr., Chief Jailer Kirk Fields, Shelby County, T. Johnson, Dontreal

Hawkins, Kimberly Wallace, Brenda McCoy; Grandberry, and Terri Parker about a year later.[1]
(ECF No. 1.)  They have since amended their Complaint.  (ECF No. 37.)

Plaintiffs allege their son's death was not a one-off; instead, it "fit a pattern of inmate
death attributable to Jail staff failing to conduct cell-pod security rounds every thirty minutes."
(*Id.* at PageID 612.)  Their Amended Complaint cites cases and investigative reports as far back
as late 1980's documenting the Jail's understaffing, overcrowding, and indirect inmate
supervision.  (*Id.* at PageID 618–21, 624–27.)  Plaintiffs also provide data showing that from
2019 to 2021, the Jail had more inmate-on-inmate assaults than all fourteen of the state-run
corrections facilities in Tennessee combined.  (*Id.* at PageID 633–34.)  Plaintiffs bring § 1983
and state-law claims against Shelby County over its staffing, supervision, and release procedures,
and against the individual Defendants under § 1983 for their conduct leading to Donald's death.
(*Id.* at PageID 637–54.)

As for Sheriff Bonner, Plaintiffs sue him in his official capacity "as the chief executive
policymaker of Shelby County with respect to the operation and management of the Jail."  (ECF
No. 37 at PageID 602.)  *See* Tenn. Code Ann. § 8-8-201(a)(3) ("It is the sheriff's duty to . . .
Take charge and custody of the jail of the sheriff's county, and of the prisoners therein[.]").
They also sue him in his individual capacity "for his actions, willful inaction, and (poor)
judgment."  (*Id.* at PageID 602, 646.)  Count Seven of the Amended Complaint alleges
supervisory liability against Bonner.  (*Id.* at PageID 646.)  Plaintiffs claim that Bonner is
responsible for Donald's death based on his failure to "reasonably respond to—including failing

---

[1] Plaintiffs also sued Lieutenant Filmore Varner, Natasha Williams, D. Robertson, Patrolman G.
Smith, and T. Baker.  (ECF No. 37.)  But Plaintiffs agreed by stipulation to dismiss these parties.
(ECF Nos. 74, 96, 123.)

to implement or approve any meaningful staffing changes in the face of—the substantial risk to inmate safety that the Jail's gross understaffing posed." (*Id.*)

Plaintiffs bring a similar supervisory liability claim against Chief Jailer Fields. They sue him in his official capacity as Shelby County's Chief Jailer. (ECF No. 37 at PageID 602.) And like Bonner, they also sue Fields in his individual capacity "for his actions, willful inaction, and (poor) judgment." (*Id.*) Court Eight of the Amended Complaint alleges Fields "failed to reasonably respond to—or indeed, take any discernable action whatsoever in the face of—the risk that the gross understaffing of the Jail posed." (*Id.* at PageID 648.)

Bonner and Shelby County first moved to dismiss the Amended Complaint for being too long and confusing. (ECF Nos. 45, 46.) Shelby County also moved to dismiss for failure to state a plausible claim for relief. (ECF No. 107.) The Court denied these Motions in July 2025. (ECF No. 142.)

Bonner and Fields now separately move to dismiss the individual capacity claims against them under Federal Rule of Civil Procedure 12(b)(6).[2] (ECF Nos. 76, 102.) Plaintiffs responded (ECF Nos. 101, 110), and Defendants replied (ECF No. 105, 112.) The Court addresses both Motions to Dismiss here.

## **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege enough facts to "state a claim to relief that is plausible on its face." *Crawford v. Tilley*, 15 F.4th 752, 762 (6th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility

---

[2] Plaintiffs correctly acknowledge that their official capacity claims are "indistinguishable from their claims against [Shelby] County as an entity and do not represent separate claims." (*Id.* at PageID 602.) *See Direct Constr. Servs., LLC v. City of Detroit*, 820 F. App'x 417, 426 (6th Cir. 2020) ("[A]n official-capacity claim is merely another name for a claim against the municipality." (citing, among others, *Cady v. Arenac Cty.*, 574 F.3d 334, 342 (6th Cir. 2009))).

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Courts accept all well-pleaded factual allegations as true here.  *Crawford*, 15 F.4th at 762.  But they need not accept or make unwarranted factual inferences.  *See Creelgroup, Inc. v. NGS Am., Inc.*, 518 F. App'x 343, 346 (6th Cir. 2013) (per curiam) (citation omitted).

Although courts generally restrict their review to the facts alleged on face of the complaint when considering a motion to dismiss, *see Diei v. Boyd*, 116 F.4th 637, 643 (6th Cir. 2024), they may also consider exhibits attached to the complaint, public records, items that appear in the record of the case, and "exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein," without converting the motion to one for summary judgment.  *Id.*  The Court thus considers the attachments to the Complaint and the certain materials referenced in the Motions to Dismiss while reviewing the record.[3]  And if a document contradicts allegations made in the complaint, the exhibit trumps those allegations unless the document supports both parties' versions of events.  *Nolan v. Detroit Edison Co.*, 991 F.3d 697 (6th Cir. 2021) (citations omitted).

---

[3] Bonner references a video from the night of Donald's attack.  (ECF No. 105 at PageID 1941.) Courts may consider video evidence on a motion to dismiss only if the video "blatantly contradict[s] or utterly discredit[s]" allegations in a complaint.  *See Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024) (brackets and quotation marks omitted) (quoting, indirectly, *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Akima v. Peca*, 85 F.4th 416, 422 (6th Cir. 2023) ("Still, at the motion to dismiss stage we rely on the videos over the complaint only to the degree the videos are clear and blatantly contradict or utterly discredit the plaintiff's version of events." (quotation marks omitted)).  The Court has reviewed the video and finds that it does not "blatantly contradict" Plaintiffs' summary of events, even though there is plenty of room to interpret the video differently.  (Compare ECF No. 107-2 (Jail surveillance video from the night of November 17, 2022) with ECF No. 37 at PageID 610–11 (Plaintiffs' alleged timeline of events from the night of November 17, 2022).)  So the Court does not consider the video here.

## ANALYSIS

Prison detainees have a constitutional right to be protected from inmate-on-inmate violence by corrections officers.[4]  *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." (citation omitted)); *see Coleman v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 130 F.4th 593, 599 (6th Cir. 2025) (""Corrections officers must protect convicted prisoners from harm under the Eighth Amendment, and they must protect pretrial detainees from harm under the Due Process Clause.") (citation omitted)).  Plaintiffs here claim that Bonner and Fields violated Donald's right to be free from harm while at the Jail.  But they do not allege that either Defendant was present at the Jail on the night Robinson attacked Donald.  Rather, Plaintiffs seek to hold Bonner and Fields liable under a § 1983 supervisory-liability theory.

---

[4] The Court acknowledges that it has yet to address which constitutional right applies to Plaintiffs' claims, and that the "threshold inquiry in a § 1983 suit" is to "'identify the specific constitutional right' at issue."  *City of Joliet, Ill.*, 580 U.S. 357, 370 (2017) (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).  Because "[t]he status of inmates confined in a correctional facility determines the constitutional right that protects them," *Lovell v. Cnty. of Kalamazoo, Mich.*, 172 F.4th 931, 936 (6th Cir. 2026) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 400–01 (2015), the answer turns on Donald's "constitutional status" at the Jail.  *See Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585, 592 (6th Cir. 2021).  Two Amendments are possible.  A convicted prisoner's failure-to-protect claim is grounded in the Eighth Amendment; a pretrial detainee's claim comes in under the Fourteenth.  *See, e.g.*, *Coleman v. Hamilton Cnty. Bd. of Cnty. Comm'rs.*, 130 F.4th 593, 599 (6th Cir. 2025).  Since Donald was release-eligible when Robinson attacked him, the parties disagree on which of these two Amendments applies here.  Defendants argue the Eighth Amendment applies because Donald was a convicted prisoner when Robinson attacked him.  (See ECF No. 76-1 at PageID 1646.)  Plaintiffs argue the more lenient Fourteenth Amendment applies because, although incarcerated, Donald was no longer confined as a term of punishment.  (ECF No. 101 at PageID 1901.)  The Court ordered—and the parties have filed—supplemental briefing on this issue.  (ECF Nos. 149, 150, 151.)  But Plaintiffs' supervisory liability claim against these Defendants fails even assuming one or more of their subordinates violated Donald's constitutional right.  That is true whether the Eighth or Fourteenth Amendment deliberate-indifference standard applies.  So the Court (again) declines to answer this question for now.

The issue therefore is whether the Amended Complaint alleges that Bonner and Fields had such active involvement in the Jail's failure to protect him from death that Plaintiffs have pleaded plausible claims against them. *See Crawford*, 15 F.4th at 761. For the reasons below, the Court finds that they have not. Bonner and Fields are thus entitled to qualified immunity because their alleged actions fail to establish a supervisory liability claim. The Court first outlines the relevant legal standards before addressing the parties' arguments.

## I.    Qualified Immunity

Section 1983 allows individuals to sue state and local officials who a plaintiff alleges has deprived them of a constitutional right.[5] 42 U.S.C. § 1983. Officials sued under this statute can assert qualified immunity doctrine as an affirmative defense. *See Wiley v. City of Columbus, Ohio*, 36 F.4th 661, 668 (6th Cir. 2022); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 817–19 (1982) (articulating the modern qualified immunity test). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Typically, a defendant has the burden to prove an affirmative defense. *Crawford*, 15 F.4th at 760 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). But the status quo changes when an official raises qualified immunity, and the plaintiff instead bears the burden of overcoming this affirmative defense. *Id.* At the motion-to-dismiss stage, a plaintiff meets this burden by plausibly alleging that (1) the defendant violated their constitutional right, and (2) that right was

---

[5] This cause of action, of course, extends to a decedent's estate's representatives. *See, e.g., Foos v. City of Delaware*, 492 F. App'x 582, 592 (6th Cir. 2012) (citations omitted).

clearly established at the time of the alleged violation.  *See, e.g.*, *Martinez v. Wayne Cnty.,*
*Michigan*, 142 F.4th 828, 835–86 (6th Cir. 2025) (citations omitted).

That burden is not all too high at this early stage of litigation so long as the complaint
plausibly alleges a constitutional violation.  *Compare Marvaso v. Sanchez*, 971 F.3d 599, 605
(6th Cir. 2020) ("This is a low bar, given that granting qualified immunity at the motion to
dismiss stage is usually disfavored. (citations omitted)), *with Myers v. City of Centerville, Ohio*,
41 F.4th 746, 759 (6th Cir. 2022) (explaining this "general preference does not at all cover
qualified immunity's *first* prong—whether the complaint plausibly alleged a constitutional
violation" (citing *Crawford*, 15 F.4th at 764–65)).  Courts address qualified immunity's two
pleading requirements in either order.  *Pearson*, 555 U.S. at 237.  And if a plaintiff fails to meet
their burden on either one, "the court need not address the other and can dismiss the plaintiff's
claim based on the defendant's immunity."  *Martinez*, 142 F.4th at PageID 836 (citation omitted).

Since Plaintiffs' claims hinge on supervisory liability, the Court begins and ends on the
constitutional violation prong.  *See Crawford*, 15 F.4th at 766 (finding a supervisor was "entitled
to qualified immunity on the constitutional violation prong" because the plaintiffs did not
plausibly allege any "active unconstitutional behavior" on the supervisor's part).

### A.    Supervisory Liability

Individual-capacity claims of supervisory liability under § 1983 require allegations that a
defendant personally caused an alleged constitutional violation.  *Venema v. West*, 133 F.4th 625,
633 (6th Cir. 2025) (citing *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016).  This
means an official cannot be held vicariously liable for their subordinate's unconstitutional
actions.  *Id.*  Because "[s]upervisors are often one step or more removed from the actual conduct

of their subordinates . . . the law requires more than an attenuated connection between the injury

and the supervisor's alleged wrongful conduct." *Peatross*, 818 F.3d at 241 (citation omitted).

It is no surprise then that supervisory liability comes with "sharp limits." *Crawford*, 15

F.4th at 761. These limits require the plaintiff to plausibly allege that (1) the defendant engaged

in "active unconstitutional behavior" as a supervisor; and (2) the defendant's unconstitutional

behavior was the factual and proximate cause of the plaintiff's injuries. *See id.* at 761–62; *see*

*also id.* at 761 ("Supervisory liability comprises two concepts important here: active involvement

by the supervisor and causation."). With this in mind, the Court first considers Bonner's Motion

before turning to Fields'.

## II.    Sheriff Bonner's Motion to Dismiss

Plaintiffs allege that Bonner is responsible for staffing policies at the Jail that caused

Donald's death. (*See generally* ECF No. 37 at PageID 624–29; ECF No. 101 at PageID 1893.)

Bonner argues the Amended Complaint fails to allege facts that show he plausibly "encouraged,

authorized, or acquiesced to any unconstitutional conduct." (ECF No. 76-1 at PageID 1646.)

And so, according to Bonner, Plaintiffs have not stated a viable supervisory liability claim

against him. (*Id.* at PageID 1641.) The Court agrees with Bonner for the reasons below.

### A.    No Active Unconstitutional Behavior

To hold a supervisor liable under § 1983, one must show the supervisor was actively

involved in the alleged constitutional violation. *See, e.g.*, *Does v. Whitmer*, 69 F.4th 300, 306

(6th Cir. 2023) ("To survive a motion to dismiss, a plaintiff must plausibly allege 'active

unconstitutional behavior,' which goes beyond 'a mere failure to act.'" (citations omitted)).

"Active" in this context does not require "that the supervisor must have physically put his hands

on the injured party or even physically been present at the time of the constitutional violation."

*Peatross*, 818 F.3d at 242 (citations omitted).  Rather, "a plaintiff must plausibly allege that a supervisory defendant 'authorized, approved, or knowingly acquiesced in the unconstitutional conduct . . . of his subordinates through the execution of his job functions." *Crawford*, 18 F.4th at 761 (quoting *Peatross*, 818 F.3d at 242); *see also Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 487 (6th Cir. 2020) ("The supervisor must have abdicated his or her job responsibility, and the '*active performance* of the [supervisor's] individual job function' must have directly resulted in the constitutional injury." (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006)).

Plaintiffs contend Bonner's "active complicity" in Donald's death takes two forms.  First, he "either implemented or approved staffing-pattern changes that de-prioritized inmate monitoring and supervision, contributing to the Jail's large uptick in inmate deaths and inmate-on-inmate assaults."  (ECF No. 101 at PageID 1898.)  Second, "by failing to take action in response to the uptick—which correlated with *both* those specific staffing-pattern changes *and* overall staffing shortages—he effectively abdicated his duty as sheriff in the face of a breakdown in the proper functioning of the Jail."  (*Id.*)

Plaintiffs support these assertions with a 57-page Amended Complaint and 33 exhibits.  (*See generally* ECF No. 37; ECF No. 101 at PageID 1893–98 (explaining "systemic allegations for supervisory liability").)  For example, the Amended Complaint cites specific deaths and injuries to other inmates at the Jail (ECF No. 37 at PageID 613–20) and reports on the Jail's inadequate staffing levels that the Shelby County Sheriff's Office received (*id.* at 625–27, 631–32).  It also refers to meetings Bonner attended where inmate deaths were likely discussed.  (*id.* at 627–28.)  And Plaintiffs allege that Bonner eliminated guard postings inside the Jail's cell pods and control rooms (*id* at PageID 624–25), and that he had the final authority to oversee

10

these staffing changes (*id.* at PageID 622–23).  As a result, Plaintiffs assert that "the Amended Complaint pleads active involvement by Bonner based on his implementation or approval of the staffing-pattern changes."  (ECF No. 101 at PageID 1909.)

### 1.    Understaffing

The Sixth Circuit has recognized that "a resource-limited official who kn[ows] of general safety concerns arising from overcrowding and understaffing problems largely outside his control" does not violate constitutional standards.  *Beck v. Hamblen Cnty., Tenn.*, 969 F.3d 592, 602 (6th Cir. 2020) (citations omitted) (discussing the clearly-established prong of qualified immunity analysis ).  The record shows that Bonner is such a resource-limited official, at least as it relates to the Jail's staffing numbers.  He has tried to hire more corrections officers.  (*See* ECF No. 76-1 at PageID 1653–54 (citing ECF No. 76-2 at PageID 1686).)[6]  The record also shows that Bonner has limited authority and control over Shelby County's budgeting process for the Jail.  (*Id.* at 1653 (citations omitted).)

Put simply, there is no plausible allegation here that Bonner in his individual capacity has control over the Jail's staffing numbers or actively tried to reduce Jail staff.  *Cf. Moderwell v. Cuyahoga Cnty., Ohio*, 997 F.3d 653, 664 (6th Cir. 2021) (finding that the plaintiff adequately pleaded active involvement, in part, because they alleged that the supervisors "knowingly *caused*" "severe overcrowding") (emphasis added).  So understaffing by itself cannot be the basis for a claim that Bonner authorized, approved, or knowingly acquiesced in unconstitutional conduct.  *See Caraway v. CoreCivic of Tenn.*, 98 F.4th 679, 685 (6th Cir. 2024) ("But the failure

---

[6] Bonner included minutes from a relevant budget meeting and the County's 2022 budget in his Motion to Dismiss.  Because these Plaintiffs cite to and refer to these records in the Amended Complaint, the Court may consider them in this posture.  *See Diei*, 116 F.4th at 643.

to adequately staff a prison—even a deliberate failure—is not itself a constitutional violation." (citing *Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012)).

### 2. Staffing Patterns

Plaintiffs seem to acknowledge that understaffing alone cannot support a claim against Bonner in his individual capacity. In their response, they narrow their argument and clarify that "the Amended Complaint also clearly attributes fault to Bonner in connection with the separate question of changes to staffing *patterns*—that is, the allocation of personnel and prioritization of staff postings." (ECF No. 101 at PageID 1898.) Plaintiffs contend that Bonner "personally implemented or approved specific changes" to staffing patterns and postings at the Jail which led to a "lack of inmate monitoring." (ECF No. 101 at PageID 1911.) To Plaintiffs, this means they have plausibly alleged that Bonner "played an active role with respect to the constitutional violations at issue." (*Id.*)

But the allegations of Bonner's personal involvement in Jail staffing are contradicted by Plaintiff's own exhibits. (*See* ECF No. 105 at PageID 1943–44.) For example, Plaintiffs point to the Jail's Roster Management procedures in support of their claim. (*See* ECF No. 37-21 at PageID 935.) But those procedures were created not by Bonner, but through the "Authority of Kirk Fields, Chief Jailer." (*Id.*) Plaintiffs have therefore not adequately pleaded Bonner "personally implemented or approved specific changes." *See Nolan*, 991 F.3d at 707 ("When a document contradicts allegations in the complaint, rendering them implausible, 'the exhibit trumps the allegations.'" (citations omitted); *Creelgroup, Inc.*, 518 F. App'x at, 347 (6th Cir. 2013) (explaining that a plaintiff cannot survive a motion to dismiss if a "written instrument plainly contradicts the pleadings" (citations omitted)). And that failure dooms their active involvement theory.

Even still, Plaintiffs argue that allowing Bonner to escape liability on a supervisory theory "would contravene longstanding precedent" because the Supreme Court in *Farmer* "expressly held corrections personnel cannot 'escape liability' in the face of 'an obvious, substantial risk to inmate safety.'" (ECF No. 101 at PageID 1916 (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994).) So Plaintiffs argue that their supervisory liability withstands Bonner's Motion because "[n]otice of a general risk to the inmate population will support supervisory liability." (*Id.* at PageID 1915.) It is true that *Farmer* held as much in the right circumstances. And it is true that, "[i]n appropriate circumstances," the Sixth Circuit "[has] attributed knowledge of obvious risks to prison officials." *Crawford*, 15 F.4th at 766 (citations omitted). But in those cases—as the Sixth Circuit has explained—the "defendants . . . had day-to-day obligations at their institution." *Id.* (citing *Stoudemire v. Mich. Dep't of Corrs.*, 614 F. App'x 798, 803–05 (6th Cir. 2015); *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004)).

The same cannot be said for Bonner on this dense motion-to-dismiss record. He "is at the very top of the chain of command and has broad duties and responsibilities to maintain multiple jail facilities, provide security for multiple courthouses and courtrooms as well as patrolling and providing civil and criminal warrants service." (ECF No. 105 at PageID 1949.) That indirect supervision is simply not enough for liability to attach when one considers Bonner's limited, if any, supervision over the Jail's staff. *Cf. Crawford*, 15 F.4th at 767 ("We've never attributed knowledge of prison conditions so high up the chain of command with so little in the way of alleged exposure to those same conditions.").

It is clear then that Plaintiffs are trying to hold Bonner liable as a supervisor just because he is the Shelby County Sheriff. But that is not enough here. *See Beck*, 969 F.3d at 601 (discussing the clearly-established prong and stating the plaintiff incorrectly tried to hold a

13

sheriff "liable on a *general* theory that would apply just as much to any assault at the jail as it would to the assault on [the plaintiff]").  The allegations of Bonner's connection to the Jail's staffing is simply "too attenuated" to show active involvement.  *See Whitmer*, 69 F.4th at 308 ("The only connection between the governors and the alleged injuries is the governors' generalized responsibility to enforce the law and their supervisory authority over the MSP." (citing *Peatross*, 818 F.3d at 241)).  Because Plaintiffs have made no well-pleaded factual allegations here that Bonner implicitly authorized, approved, encouraged, or knowingly acquiesced in Donald's death—or even took part in the staffing procedures that Plaintiffs allege caused his death—Plaintiffs have not stated a supervisory liability claim against Bonner.  The Court therefore **GRANTS** his Motion to Dismiss.

## III.    Chief Jailer Fields' Motion to Dismiss

The analysis above applies in large part here, and the Court also resolves the claim against Fields on the active involvement element.  Plaintiffs argue that Fields "implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of [an] offending subordinate" by "approv[ing] certain changes to the post-category system that contributed to the lack of inmate monitoring and supervision."  (ECF No. 110 at PageID 1997; *see* ECF No. 37 at PageID 647–48.)  Like Bonner, Fields argues this claim fails because he did not engage in any active unconstitutional behavior.  (ECF No. 103 at PageID 1930.)  Plaintiffs fail to state a supervisory liability claim against Fields for the reasons below.

To be sure, Fields as Chief Jailer was closer than Bonner to the Jail's day-to-day operations.  *Cf. Crawford*, 15 F.4th at 766–67 (noting that the Sixth Circuit has held wardens liable on a supervisory liability theory (citations omitted)).  But Fields' role over the Jail by itself does not give rise to a plausible supervisory allegation without something more.  Remember,

14

Plaintiffs must, "at a minimum," plausibly allege that Fields "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Peatross*, 818 F.3d at 242 (citation omitted). And they can do this by pleading facts showing Fields "abandone[ed] the specific duties of his position . . . in the fact of actual knowledge of a breakdown in the proper workings of the [Jail]." *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (quoting *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992)); *see Winkler v. Madison Cnty.*, 893 F.3d 877, 898–99 (6th Cir. 2018) ("In other words, the supervisor must have abdicated his specific job responsibility, with the '*active performance* of the supervisor's individual job function . . . directly resulting in the constitutional injury." (citation modified) (quoting *Gregory*, 444 F.3d at 752)). The Court next considers the specific facts Plaintiff allege against Fields before determining whether they state a claim against him.

### A.     Staffing Changes

Plaintiffs rely heavily on the Jail's staffing patterns for their active involvement theory. According to Plaintiffs, Fields eliminated guard postings inside cell pods and control rooms. (ECF No. 110 at PageID 1997–99, 2003.) They claim that these staffing changes removed guards from Donald's cell pod and the control room that monitored his cell pod. (*id.* at PageID 1989.) Plaintiffs add that if the cell pod had been supervised, corrections officers "would have intervened in the altercation . . . before Robinson managed to strangle Donald—or at least before Donald spent a significant time on the floor not breathing." (*Id.*)

Briefly explaining the Jail's post-classification system helps one better understand this argument. The Jail's Roster Management form states that the "Chief Jailer or designee will submit a list of position classifications that are essential to the operation of the [J]ail." (ECF No. 37-21 at PageID 926.) And as mentioned, the record shows that Fields created this form or at

least authorized it.  The Roster Management procedures classify guard "posts" as either "fixed,"

"pull," or "shutdown."  (*Id.* at PageID 924–25.)  "Fixed" posts are "critical to the operation and

safety of the facility," and must always be "manned."  (*Id.* at PageID 924.)  "Pull" posts "may be

left vacant for part of a shift."  (*Id.* at PageID 925.)  And "shutdown" posts "may be left vacant

for an entire shift."  (*Id.*)

Plaintiffs allege that Donald's cell pod was "critical to safely operating the Jail and had

originally been categorized as much."  (*See* ECF No. 110 at PageID 1998.)  But in November

2022, Plaintiffs allege that Fields allowed Donald's cell pod post to be left partially vacant during

guard shifts.  (*See id.*)  They explain:

> Crucially, the reclassification of staff postings from critical to noncritical would
> have fallen to Fields.  The Roster Management policy gave him authority to
> provide a list of which positions were essential to Jail operation, which therefore
> got categorized as "fixed."  He also had authority to update that list as necessary.
> For Lieutenant Parker to have been permitted to assign only three security
> personnel to the third floor of the Jail for the night in question, and for Lieutenant
> Parker and Sergeant Parker to have left the third-floor control room empty, Fields
> must at some point have approved the reclassification of those posts.

(*Id.*)  Plaintiffs contend this explanation is enough to plead that Fields "abdicated the duties of

his office" because it is "plausible that Fields, as the officer with primary responsibility for the

operation of the day-to-day operation of the Jail, knew of the staffing problems and lack of

inmate supervision."  (ECF No. 110 at PageID 1999–2000.)  Putting this all together, Plaintiffs

argue that Fields was actively involved—or at least knowingly acquiesced—in the indirect

supervision of Donald's cell pod on the night Robinson attacked him.

### B.    No Active Involvement

This Court finds otherwise.  The Court begins with two cases Plaintiffs cite—*Peatross v.*

*City of Memphis* and *Coley v. Lucas County*—where the plaintiffs sufficiently pleaded active

involvement.  In *Peatross*, the plaintiffs alleged that a police director among other things "failed

to train and supervise the officers to avoid the use of excessive force, failed to investigate the allegations of excessive force properly, and attempted to cover-up the unconstitutional conduct of his subordinates by exonerating the officers in an effort to escape liability." 818 F.3d at 243. And in *Coley*, the plaintiffs alleged that a sheriff failed to train officers not to use chokeholds and that the sheriff "made false statements to federal officials" to "cover up" his officers' unconstitutional actions. 799 F.3d 530, 542 (6th Cir. 2015). It takes little discussion to see why a supervisor covering up their subordinate's unconstitutional acts shows active involvement. Plaintiffs make no similar allegation here.

Another case Plaintiffs rely on, *Taylor v. Michigan Department of Corrections*, does not change this conclusion. (*See id.* at PageID 2001.) In *Taylor* a small and slender "mildly mentally retarded" man with "youthful looking features" was raped by another inmate after being transferred to a corrections facility. *Taylor*, 69 F.3d at 77–78. The evidence at summary judgment showed that the warden was responsible for "reviewing and approving all [prisoner transfers] . . . and it was his responsibility to implement procedures that would protect vulnerable inmates from dangerous transfers." *Id.* at 80. It also showed that the plaintiff was the type of prisoner "especially vulnerable to sexual pressure." *Id.* at 82. Yet the warden knew his subordinates were "redelegating his authority over transfers to lower echelon prison staff" and that he had no procedures in place to review inmate transfers. *Id.* at 80. The Court found therefore that a jury could conclude that the warden "personally had a job to do, and that he did not do it." *Id.* at 81.

The Sixth Circuit has since explained that the "active acquiescence in known misconduct" shown in *Taylor* reaches the "outer bounds" of what is required to show the "'active performance' necessary for a supervisory liability claim." *Winkler*, 898 F.3d at 899 (quoting

*Essex v. Cnty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013); *see id.* (noting the same for

*Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992)), a case holding a supervisor liable when he

personally referred inmate medication complaints to a head nurse who he knew was altering or

destroying inmate prescriptions).

The Court finds that Plaintiffs' allegations against Fields do not rise to the "outer bounds"

of plausible facts needed to state a supervisory liability claim.  Unlike *Taylor*, there is no

plausible allegation that Fields "abandoned his duties" when reclassifying post positions.  The

active conduct in *Taylor* concerned the supervisor's *complete* failure to do *his* job.  But here

Plaintiffs allege that Fields' staff members failed to do *their* jobs: Plaintiffs specifically allege

and argue in their response that "Lieutenant Parker and Sergeant [Johnson] left the third-floor

control room empty."[7]  (*See* ECF No. 110 at PageID 1998.)  To the extent that Parker and

Johnson violated Donald's constitutional right, Plaintiffs impermissibly seek to hold Fields liable

for their actions, a practice the Sixth Circuit has routinely cautioned against.  *See, e.g.*, *Winkler*,

893 F.3d at 898 ("This court has held that liability cannot be imposed on a supervisor under §

1983 based on the theory of respondeat superior." (citations omitted)).

Further, Plaintiffs readily admit that the Jail was understaffed.  (*See* ECF No. 37 at

PageID 647.)  But the Jail's understaffing—and in effect, the placement of that limited staff in

the Jail—does not equal active involvement.  The Jail had to place the few corrections officers

somewhere.  That Plaintiffs allege Field's post-classification system did so "inadequately" is not

enough to allege he "completed abdicated any of his responsibilities."  *See Essex*, 518 F.  App'x

at 357 ("'[W]hereas the County's liability may be premised on its policymaker's deliberate

---

[7] Plaintiffs name "Sergeant Parker" here, but that appears to be a typo.

indifference,' the individual defendant may be liable only upon a showing of personal

involvement." (quoting *Harvey v. Campbell Cnty.*, 453 F. App'x 557, 563 (6th Cir. 2011)).

In sum, Fields' active involvement in the Jail's allegedly inadequate staffing does not

meet supervisory liability's "sharp limits."  Because Plaintiffs have not pointed out any case

finding active involvement on facts such as this,[8] it follows that their attempt to hold Fields

personally liable for the Jail's staffing patterns is not enough to state a claim.  But this finding

does not leave Plaintiffs without any remaining claims.  Indeed, the Court denied Shelby

County's Motion to Dismiss here.  (*See* ECF No. 142.)  *See Beck*, 969 F.3d at 592 ("Sheriff

Jarnagin's entitlement to qualified immunity does not leave Beck without any potential recourse

for the assault that he claims to have suffered and the general safety concerns that he identified.

After all, Beck also sued Hamblen County.").  At any rate, Plaintiffs have not alleged plausibly

facts that Fields took an active role in the alleged unconstitutional conduct here.  And so the

Court **GRANTS** his Motion to Dismiss.

## **CONCLUSION**

The Court does not turn a blind eye to the systemic issues that have long plagued 201

Poplar.  But that does not mean that Plaintiffs have stated a supervisory liability claim against

Sheriff Bonner and Chief Jailer Fields.  For the reasons above, the Court thus **GRANTS**

Bonner's and Fields' Motions to Dismiss.

**SO ORDERED**, this 26th day of May, 2026.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE

---

[8] The closest case is *Johnson v. CoreCivic, Inc.*, No. 18-1051, 2018 WL 5798534 (W.D. Tenn. Nov. 5, 2018).  But the Court hesitates to rely on a single unpublished district court opinions here.  *See Arrington-Bey v. City of Bedford Heights*, Ohio, 858 F.3d 988, 993 (6th Cir. 2017).